# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVELERS PERSONAL INS. CO. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | NO. 08-3138 |
| v. | : | |
| | : | |
| ESTATE OF SCOTT PARZYCH & | : | |
| JACQUELINE PARZYCH | : | |
| | : | |
| Defendants. | : | |

December _2_, 2009                                                    Anita B. Brody, J.

## MEMORANDUM

### I. INTRODUCTION

Plaintiff, Travelers Personal Insurance Company ("Travelers"), brings this suit against Defendants, the Estate of Scott Parzych and Jacqueline Parzych ("the Parzychs"), seeking a declaration that it is not obligated to provide underinsured/uninsured motorist ("UIM") benefits to Scott's Estate under the insurance policy held by his mother, Jacqueline. The parties have filed cross-motions for summary judgment, as well as their respective responses and replies.

### II. FACTUAL BACKGROUND

The following facts are not in dispute. On November 15, 2007, Scott Parzych was killed in a motor vehicle accident. Scott was not at fault; he was merely a passenger. His death came less than four months after his marriage to his girlfriend of five years, Julie Cajina, on August 24, 2007. After the wedding, Scott, Julie, and Julie's son, Tyler, returned to their life as a family unit in an apartment at 30 West Vine St. in Hatfield, Pennsylvania, where all three had been living for

the previous year (approximately).  Both Julie and Scott were co-signors for the apartment lease.

Prior to their move into the Hatfield apartment, Julie had lived with Tyler alone in an apartment in Telford, Pennsylvania, and Scott had lived at the house his parents rented in North Whales, Pennsylvania.  Scott, Julie, and Tyler moved to the apartment in Hatfield, which was approximately fifteen minutes away from Scott's parents' house, because Scott and Julie wanted to live together and they needed more space for Tyler.

Scott was the youngest of three children of Val and Jacqueline Parzych.  Prior to his moving in with Julie, Scott had always resided with his parents in their North Whales house. Even after moving in with Julie, Scott frequently visited his parents' house, mostly on the weekends, often sleeping over there with Julie and Tyler.  According to Jacqueline, Scott came over to her house at least once a week.

Both Julie and Tyler felt welcome at the Parzychs' house.  Scott's parents often babysat Tyler so that Julie and Scott could socialize.  For example, Julie and Scott were in a billiards league and when they played nearby the North Whales house, they often dropped Tyler off with Scott's parents and slept over after league play ended that night.  In the morning, Julie and Scott would take Tyler home with them to their apartment.  Scott, Julie, and Tyler all left personal effects at the North Whales house, including clothes and toiletries.  The house has five bedrooms and there was always room for Scott, Julie, and Tyler.

It was only on rare occasions that Scott stayed at his parents' house without Julie and Tyler.  Scott worked at a pool installation business, located only blocks away from his parents' house.  Sometimes when heavy snowfall was predicted, Scott stayed over at the house, helped shovel snow in the morning, and walked to work.  From time to time, he also stopped by the

house in the middle of the day when there was a lull at work, primarily to graze for food in the kitchen or go on the computer. Scott's old bedroom still housed his bed, dresser, and radio. He also still received some mail at his parents' house, although his credit card bills, bank statements, and cell phone bills were delivered to the Hatfield apartment.

At the time of his death, Scott was listed as an insured driver on two Travelers insurance policies–one held by Jacqueline and the other held by Julie. Jacqueline obtained her policy from her insurance agent, Steven Canuso, in August of 2002. Canuso encouraged Jacqueline to include Scott on the policy because at the time Scott was living with his parents. However, when Scott moved in with Julie and Tyler, Jacqueline never updated the policy. Canuso also did not update the policy even though Scott had told him that he was living with Julie and going to marry her.

Julie also obtained her policy from Canuso. After Scott's death, Travelers paid Julie, the Administratrix of Scott's Estate, the policy limits for the UIM benefits to which the Estate was entitled under her policy. Nevertheless, the Estate also made a claim to doubledip for UIM benefits under Jacqueline's policy. Travelers has refused to pay any additional UIM benefits because it believes that Scott was not a resident of Jacqueline's home at the time of his death.

### III. JURISDICTION AND LEGAL STANDARD

This Court has subject matter jurisdiction under 28 U.S.C. § 1332.[1] Under the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity must apply the substantive law of the forum state, as set forth by the highest court in the state. *Packard v.*

---

[1] Travelers is an insurance company with a domicile and place of business in Hartford, Connecticut. Both Julie and Jacqueline Parzych are residents of Pennsylvania. The amount in controversy exceeds $75,000.

*Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993). As this is a contract dispute, Pennsylvania's choice of law rules for contract cases control. Pennsylvania generally applies "the law of the place with the most significant contacts with, and the most interest in, the dispute." *Pollard v. Autotote, Ltd.*, 852 F.2d 67, 70 n.3 (3d Cir. 1988). The contract at issue here was signed in Pennsylvania and the Parzychs live and work in Pennsylvania; therefore, Pennsylvania law applies to this dispute. *See id*.

Under Fed. R. Civ. P. 56(c)(2), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id*. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

## IV. DISCUSSION

Both Julie and Jacqueline's policies define an "insured" party in part as:

1. [The named insured] or any "family member";
2. Any other person "occupying" "[the named insured's] covered auto" if the occupancy is (or is reasonably believed to be) with [the named insured's] permission.

A "family member" is defined as "a person related to [the named insured] by blood, marriage or adoption who is a resident of [the named insured's] household. This includes a ward or foster child." Travelers' argument is simple: Scott was not a resident of his mother's household at the time of his death and therefore his Estate is not entitled to UIM benefits under Jacqueline

-4-

Parzych's policy terms. The Parzychs argue that Scott was a resident both of his mother's household and his wife's household and therefore Travelers should honor both policies. Thus, my first responsibility is to establish where Scott "resided" at the time of his death. The Parzychs also contend that Travelers is estopped from arguing that Scott is not entitled to UIM benefits under Jacqueline's policy because Travelers continued to accept her premium payments even after Canuso, the insurance agent, knew that Scott had moved into the Hatfield apartment. Therefore, my second responsibility is to determine whether Jacqueline reasonably relied on Travelers or Canuso's behavior in her belief that Scott was entitled to UIM benefits under her policy. Considering both the residency and estoppel issues, the Parzychs' arguments fail and summary judgment will be entered on behalf of Travelers.

## A. Residency of Scott Parzych

The term "resident" has been analyzed thoroughly by the courts of Pennsylvania and the Third Circuit.[2] *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.* is the most oft-cited Pennsylvania State court case regarding the definition of a "resident" in the insurance policy context. 545 A.2d 343 (Pa. Super. Ct. 1988).[3] The court defined "residence" by distinguishing it from "domicile" –"domicile" being "where a man has his true, fixed and permanent home . . . to which . . . he has the intention of returning," and "[r]esidence being a factual place of abode." *Id*. at 346 (internal quotation marks omitted). The court determined that residence requires "only physical presence" and "carr[ies] the more transitory meaning." *Id*. *Amica*'s progeny explain that "residence" lacks

---

[2] Pennsylvania law applies. The job of this Court is to predict how the Pennsylvania Supreme Court would decide this case. *See Debiec v. Cabot Corp.*, 352 F.3d 117, 128 (3d Cir. 2003).

[3] In *Amica*, the court examined an insurance policy that defined "family member" in the same way it is defined in both Jacqueline and Julie's policies. *See id*. at 344 n.1.

intent and is defined purely in terms of physical facts. *See Nationwide Mut. Ins. Co. v. Budd-Baldwin*, 947 F.2d 1098, 1102 (3d Cir. 1991); *Allstate Prop. & Cas. Ins. Co. v. Jaffe*, No. 07-3003, 2008 WL 3911048, at *2 (E.D. Pa. Aug. 21, 2008). Moreover, the Third Circuit, in *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428 (3d Cir. 1991), noted that in this context the word "resides"[4] "contemplates, at a minimum, some consistent, personal contact with that person's home. Occasional, sporadic, and temporary contacts are insufficient."[5] *Id*. at 1431-32.

With this understanding of the term "resident" in mind, the next step is to examine the evidence marshaled by the Parzychs to support their contention that Scott was a resident of both the Hatfield apartment and his parents' house. In brief, their evidence is as follows:

- At the time of his death, Scott's Pennsylvania driver's license stated that he lived at his parents' address in North Whales.

- On the police report, Scott's address is listed as being the same as his parents' address.

- On Scott's 1099 income tax form for 2007, his address is listed as being the same as his parent's address.

- Scott received mail from his billiards league and he received bills related to his fatal accident at the North Whales address.

- Prior to his death, Scott stayed at his parents' house at least once a week. He had his own room there and kept personal belongings such as clothes, a bed, a stereo, a dresser, and toiletries such as a toothbrush, toothpaste, deodorant, a razor, and shampoo at his parents' house.

- Scott often ate lunch at his parents' house and stayed the night to help shovel snow whenever a heavy snowstorm was predicted.

---

[4] A resident is "one who resides or dwells in a place for a period of more, or less, duration." *Black's Law Dictionary* 1309 (6th ed. 1990).

[5] In *Lewis*, the court was concerned with the phrase "living with you" rather than "resident in your household," but considered the phrases to be similar in its analysis. 935 F.2d at 1432.

The Parzychs cite no case law to suggest that such evidence is sufficiently probative of Scott's purported dual residence. Instead, several cases demonstrate that the opposite is true. For example, the facts of *St. Paul Fire & Marine Ins. Co. v. Lewis, supra*, are particularly analogous to the present case. In *Lewis*, the primary issue before the Third Circuit involved the residency of a young man who caused a serious multi-car accident on the Benjamin Franklin Bridge. A month prior to the accident, the man began leasing a two-bedroom apartment, which he shared with a roommate, located approximately twenty minutes from his parents' condominium. The evidence showed that "his parents maintained a separate room for him . . . where he kept some personal belongings; he recorded his address as [his parents' address] on his drivers license, bank deposit slips, personal checks, 1982 and 1983 tax returns, job applications, and Federal Aviation Administration pilot's records; and he received mail at his parents' condominium." *Id*. at 1430. In addition, he "frequented his parents' condominium to visit, eat meals, and celebrate the holidays; [and] he considered his parents' [place] to be his 'home.'" *Id*.

*Lewis*, like the present case, was situated as a declaratory relief action, and the defendants in that case argued, as do the Parzychs, that the insurance policy in question was ambiguous as to whether a person could live in more than one place at a given time. The court noted that prior to examining whether the policy was ambiguous, the defendants first had to prove that the tortfeasor resided in more than one place. It concluded that "the insurance contract unambiguously requires a party to maintain regular personal contacts with the insured's home," and that the defendants had not shown that to be the case with regard to the tortfeasor and his parents' home. *Id*. at 1433.

In *Amica*, *supra*, the Pennsylvania Superior Court dealt with the complicated living situation of a divorced couple's teenage daughter. At the time of the accident in that case, the

-7-

daughter was living with her mother but "stayed overnight at her father's house three to five times a month. . . . [She] had a closet or two full of clothes at her father's house, approximately forty pairs of shoes, books, cosmetics, stuffed animals, tennis equipment, and a pet rabbit. She received mail there as well." 545 A.2d at 345. Despite this evidence, the court determined that it was clear that the daughter resided only at her mother's house at the time of the accident. The court concluded that the daughter "had made only 'sporadic' visits to her father's house . . . [and] that the personal items [that she] kept [there] . . . were for convenience and did not evidence that she physically lived there." *Id*. at 346.

In *Nationwide Mut. Ins. Co. v. Budd-Baldwin*, 947 F.2d 1098 (3d Cir. 1991), the Third Circuit examined the residency status of a man who, prior to the car accident that took his life, lived and worked in New Jersey but spent his weekends at his adult sister's home to be close to his fiancee.[6] The court noted that the man stayed with his sister almost every weekend, but that he did so only because it "was a convenient place to stay." *Id*. at 1103. The court determined that the decedent was merely a visitor in his sister's house and that "however frequent or welcome his visits might have been, he did not 'regularly live' in her household." *Id*. It concluded that "[t]emporary visits, however frequent or regular, are simply insufficient to establish residency." *Id*. at 1102 (citing *Amica*).

Significantly, the Parzychs cannot distinguish their case from the precedent established in *Lewis*, *Amica*, and *Budd-Baldwin*. Scott's occasional, temporary contacts with his parents' house at the time of his death do not establish that he resided there. Even though Scott, Julie, and Tyler

---

[6] In *Budd-Baldwin*, the court was concerned with the phrase "regularly lives in your household" rather than "resident in your household," but still cited *Amica* as its analytical foundation. 947 F.2d at 1102-03.

were always welcome to visit, the fact that they frequently took advantage of such generosity does not mean that Scott resided at his parents' house. The undisputed facts are that:

- Scott lived with his girlfriend and then wife, Julie, and her son Tyler in the Hatfield apartment for over a year prior to his death.

- His credit card bills, bank statements, and cell phone bills were delivered to the Hatfield apartment.

- When he did sleep over, it was almost always a matter of convenience, whether it was to help shovel snow, for work reasons, or because billiards league play was nearby.

- Sometimes, when Jacqueline babysat Tyler, Scott and Julie slept over so as not to disturb Tyler. But the next day, they would take him home to their apartment.

- During Jacqueline Parzych's deposition she was asked, "If someone were to ask you around that time period [of Scott's death] who lived at your house, what would you say?"

    Jacqueline answered, *"Scott did have his apartment. So I guess I would say that was his main residence. . . .* [H]e had a key, as did Julie, and they stopped in [at my house] . . . at all different times." (Jacqueline Parzych Dep. 24:14-22, June 9, 2008.) (emphasis added).

Scott's mother's words perfectly describe a person who has only one residence, but also has "occasional, sporadic, and temporary contacts" elsewhere. Such contacts are insufficient to establish residence. *See Lewis*, 935 F.2d at 1431-32. Thus, contrary to what the Parzychs argue, this case does not present a situation of such factual complexity as to raise the specter of ambiguity. *Cf. Budd-Baldwin*, *supra*, 947 F.2d at 1103 (children of divorced parents); *Aetna Cas. & Sur. Co. v. DeBruicker*, 838 F. Supp. 215, 220-21 (E.D. Pa. 1993) (college students); *United Servs. Auto. Ass'n v. Evangelista*, 698 F. Supp. 85 (E.D. Pa. 1988) (active duty military stationed abroad). Summary judgment shall be granted in favor of Travelers on this issue.

**B. Estoppel**

Under Pennsylvania law, the unambiguous terms of an insurance policy control only "[i]n the absence of an affirmative misrepresentation by the insurer or its agent about the contents of the policy." *West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 168 (3d Cir. 2007). If an insurer or its agent makes affirmative misrepresentations, the harmed party may use equitable estoppel to overcome a policy's clear terms. "'[E]quitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct.'" *West Am. Ins. Co. v. Park*, 933 F.2d 1236, 1239 (3d Cir. 1991) (quoting *Straup v. Times Herald*, 423 A.2d 713, 720 (Pa. Super. Ct. 1980)).

In *Budd-Baldwin*, *supra*, 947 F.2d at 1104, the Third Circuit explained that a finding of estoppel in an insurance case such as this could be based either on 1) an insurance company's acceptance of a premium, or on 2) the insurance agent's representations about the policy's coverage. Both are conditioned upon reliance by the beneficiary or policyholder. Ultimately, the court determined that the facts of the case prevented the policyholder from succeeding under either estoppel theory due to a lack of reliance. *Id*. at 1104-05. The present case is analogous to *Budd-Baldwin*, and I too conclude that estoppel is inappropriate based upon the facts.

**1. Acceptance of a Premium**

In *Budd-Baldwin*, the Third Circuit was fairly brief in dismissing the policyholder's "acceptance of a premium" theory. Under Pennsylvania law, "the public has a right to expect that they will receive something of comparable value in return for the premium paid" on an insurance policy. *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978). The

*Budd-Baldwin* court determined that the insurance company in that case "accepted the premium in exchange for extending 'occasional driver' coverage to [the decedent]." 947 F.2d at 1104. However, the court concluded that because the decedent was neither a resident of his sister's household, nor was he traveling in a car covered by his sister's auto insurance policy at the time of the accident, his "occasional driver" status did not entitle him to underinsured benefits. *Id*. at 1104-05. The court drew support for its conclusion from *Amica*, *supra*, wherein "the Pennsylvania Superior Court held that a person listed on the policy as an 'operator' could not recover unless at the time of the accident, she was operating one of the automobiles listed as covered in the policy." *Budd-Baldwin*, 947 F.2d at 1104. In *Caron v. Reliance Ins. Co.*, 703 A.2d 63 (Pa. Super. Ct. 1998), the Pennsylvania Superior Court further explained that "[t]his Court has never held that simply being listed as a driver on an insurance policy automatically transforms an individual into a class one insured"[7] entitled to benefits. *Id*. at 68 (citing *Amica*).

The lesson to be gleaned from these cases is that for a party to be transformed from merely a "listed driver" (or operator or occasional driver) to a "listed driver entitled to UIM benefits," that party must meet some additional requirements of the insurance policy. Typical requirements, under *Amica*, *Budd-Baldwin*, and *Caron*, include being a resident relative of the named insured's household, or permissively operating a vehicle listed on the named insured's policy at the time of an accident. The analysis in the present case can be no different than that of *Amica* and *Budd-Baldwin*. In both cases the policyholder paid a premium to have the decedent listed on his or her policy. Both courts implied that the insurance company's acceptance of the

---

[7] Class one insured status is traditionally conferred on "the named insured and any designated insured, and spouses or relatives if members of the same household." *Caron*, 703 at 67 n.6.

premium may have entitled the decedent to UIM benefits had the decedent been a resident of the named insured's household or traveling in one of the vehicles listed on the named insured's policy at the time of the accident. Neither of those conditions were satisfied in either case, so in neither case was the decedent entitled to benefits.

In this case, Jacqueline was paying a premium to have Scott listed on her policy.[8] However, Scott was not a resident of his mother's household at the time of his death. *See supra* Part IV.A. In addition, while it is unclear from the parties' filings whether Scott was traveling in one of the cars listed on Jacqueline's policy at the time of his death, it is the Parzychs' responsibility to provide evidence to support their estoppel argument. *See Budd-Baldwin*, 947 F.2d at 1106; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Skinner Engine Co.*, 188 F.3d 130, 151-52 (3d Cir. 1999) (refusing to reverse summary judgment because appellants "bear the burden of proof on each estoppel element"). Because the Parzychs have failed to show that Scott was traveling in a listed car or that he was a resident of Jacqueline's household, they cannot demonstrate that Jacqueline reasonably relied on the fact that Travelers accepted her premiums in her belief that Scott was entitled to UIM benefits under her plan. After Scott changed residences, Jacqueline was entitled to reasonably expect only that Scott would receive UIM benefits under her policy if he was driving a car listed on her policy when an

---

[8] Travelers admits that Jacqueline Parzych paid additional premiums to keep Scott on her policy as a listed driver. (Pl.'s Response to Defs.' Mot. Summ. J. 10.) Mr. William F. Dunn, one of Travelers' underwriters, explained in his deposition that Jacqueline was not charged a premium for Scott's coverage under her policy from 2003 to 2006 because Scott was designated as a "driver insured elsewhere." (Dunn Dep. 23:10-24:17, April 14, 2009.) However, Travelers' policies changed at some point; a month prior to when Jacqueline's policy was renewed in August 2006, Travelers began charging her a premium of three percent for Scott. (*Id*. at 24:7-31:10.)

accident occurred. Consequently, in accordance with *Budd-Baldwin* and *Amica*, the Parzychs' "acceptance of a premium" estoppel argument cannot succeed.

### 2. Insurance Agent's Representations

The importance of an insurance agent's representations in a dispute over an insurance policy cannot be overstated. "Through the use of lengthy, complex, and cumbersomely written . . . policies . . . the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent." *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 926 (Pa. 1987) (quoting *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353-54 (Pa. 1978)) (internal quotation marks omitted). "Consumers . . . view an insurance agent . . . as one possessing expertise in a complicated subject. It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself." *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366, 368 (Pa. 1977).

However, the Pennsylvania Supreme Court has found a "crucial distinction between [misrepresentation] cases . . . and cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for." *Tonkovic*, 521 A.2d at 925. In cases in which the consumer can identify no affirmative misrepresentations by the insurer or its agents, the clear language of the contract controls. *Matcon Diamond, Inc. v. Penn Nat'l Ins. Co.*, 815 A.2d 1109, 1115 (Pa. Super. Ct. 2003) ("[M]ere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage.").

In *Budd-Baldwin*, *supra*, the Third Circuit examined the policyholder's argument that her insurance agent's representations about the extent of her policy's coverage induced her to pay

elevated premiums in the belief that such payments would entitle her brother, the decedent, to UIM benefits. The court wrote that the policyholder had not provided any evidence that her agent had "promised availability of first party or underinsured benefits. . . . The [agent's] statements . . . establish nothing more than an assurance by [the agent] that [the decedent] had coverage, which in fact he had, as an occasional driver." 947 F.2d at 1105.

In the present case, as in *Budd-Baldwin*, there is no evidence that Canuso made any specific representation to Jacqueline that listing Scott on her policy would always entitle Scott to UIM benefits as long as she paid her premiums. The only evidence the Parzychs provide to show that Canuso made any sort of representation about benefits coverage is revealed in Jacqueline's deposition testimony. She testified that when she first obtained the policy in 2002, she initially planned to list only herself, her husband, Val, and her other son, David. When Canuso asked her if anyone else lived with her at the time, she told him that Scott lived with her but had his own insurance policy so she did not think it was necessary to list Scott on the policy. (Jacqueline Parzych Dep., *supra*, 26:16-24.) According to Jacqueline, Canuso responded, "'Well, you should list him anyway, because you never know when he might drive your car, and he should be covered." (*Id*. at 27:1-3.) Even if Canuso did make this representation, it is not sufficiently probative evidence that he promised that Scott would be entitled to UIM benefits if Scott's residency status changed and he was not driving one of his parents' cars.

The only issue that could distinguish *Budd-Baldwin* and the present case concerns Canuso's awareness of the change in Scott's residency status. In *Budd-Baldwin*, the court determined that the defendant had made "no specific showing" that the defendant's insurance agent was made aware of the decedent's residency status prior to his death. 947 F.2d at 1105.

The court found that "[a]lthough [the agent] testified that she knew that [the decedent] spent much of his time in New Jersey, she stated that she thought he went there only for business purposes. This does not constitute evidence that [the agent] knew that [the decedent] was residing in his own home in New Jersey." *Id*. at 1106.

In the present case, it is likely that Canuso did know that Scott was no longer a resident of Jacqueline's household for a period of time during which Travelers collected premiums from Jacqueline. However, Canuso's awareness of the change in Scott's residency status is irrelevant unless there is evidence that, after becoming aware of Scott's move, Canuso made representations to Jacqueline, which she relied on, that Scott would still be entitled to UIM benefits under her policy. *See West Am. Ins. Co. v. Park*, 933 F.2d 1236, 1239 (3d Cir. 1991). The Parzychs have supplied no such evidence. Canuso's 2002 representation to Jacqueline about Scott's coverage under her policy was based on the understanding that Scott was living at her house. There is no evidence that Canuso made any representations to Jacqueline about Scott's coverage after Scott moved to the Hatfield apartment. The absence of such evidence warrants summary judgment for Travelers on this issue. *See Budd-Baldwin*, 947 F.2d at 1106.

**V. Conclusion**

For the foregoing reasons, Travelers' Motion for Summary Judgment is granted and the Parzychs' Motion for Summary Judgment is denied.

s/Anita B. Brody

_____
Anita B. Brody, J.

O:\ABB 2009\L - Z\Travelers Personal Ins. Co. v. Estate of Scott Parzych, SJ Memorandum.wpd